Mr. Chief Justice McWilliams
delivered the opinion of the Court.
This is an original proceeding in discipline filed in this court by the Attorney General wherein the respondent, John J. Tobin, who was admitted to the Colorado Bar on March 14, 1949, was charged with the commission of various and sundry acts of professional misconduct which were alleged to be contrary to the highest standards of honesty, justice and morality.
In a pre-trial conference before our Grievance Committee most of the various allegations contained in the several complaints filed in this matter by the Attorney General were admitted by the respondent. Thereafter, further hearings were held before the Grievance Committee, with several witnesses, including the respondent, testifying at length before that body. In due time the Grievance Committee filed with us its Report, Findings, Conclusions and Recommendations.
Our study of the record leads us to conclude that because of the respondent’s misconduct constituting gross professional negligence, he should be indefinitely suspended from the practice of law. In support of our conclusions we shall now summarize the more serious and repeated misdeeds of the respondent, on a case-by-case basis.

*220
THE ROSSOW ESTATE

One Lee Rossow died on September 19, 1959 and his widow, who was appointed administratrix of the estate, engaged respondent as attorney for her and the estate and he served in that capacity until October 3,1966, when he was removed as attorney by order of court. While thus serving as attorney for this estate respondent’s derelictions were many. Specifically, he failed to file an inventory and also failed to file an inheritance tax application. As a result of this latter omission the Inheritance Tax Department on May 5, 1965 made an arbitrary assessment fixing the assets of the estate as having a total value of $40,000 and assessing a tax of $655, even though the estate was in reality insolvent. Furthermore, respondent caused the administratrix to pay the sum of $3,006 to the J. I. Case Company without first obtaining permission from the county court to do so and upon the misrepresentation by respondent to the administratrix that the county court had in fact ordered the claim to be paid. Similarly, respondent caused the administratrix to pay the sum of $250 to a mortuary upon his representation that the claim had been approved by the county court, when in fact it had not. Additionally, respondent failed to file an election to take a widow’s allowance thereby depriving the widow of such allowance. Finally, when respondent was by order of court removed as attorney for the estate and was directed to turn the files over to other counsel, he refused and only after he was actually cited for contempt did he reluctantly comply with the aforesaid order of court.

THE J. I. CASE COMPANY CLAIM

This particular claim arises out of proceedings in the Rossow estate. Mr. Rossow at the time of his death was apparently an implement dealer and sold tools and equipment given him on a conditional sale basis by the J. I. Case Company. As a result of this relationship the Case company asserted a claim of some sort against the Rossow *221 estate. After the respondent was removed as attorney for the estate he made a so-called “accounting” to the newly appointed attorney for the estate. In his accounting the respondent reported that he had received the sum of $1,000 from the sale of certain tools and equipment belonging to the decedent and in connection therewith actually delivered to the newly appointed attorney for the estate the sum of $650, with the balance of $350 ostensibly representing expenses, of some type. Later, under oath, in a hearing in the district court for Larimer County, the respondent admitted that he had not sold any tools and equipment for $1,000, or for any sum whatsoever and on the contrary, he had simply delivered the tools and equipment to the J. I. Case Company as partial settlement of its claim against the Rossow estate. Respondent admitted that his so-called accounting was spurious and that the sum which he delivered to the newly appointed attorney for the estate was actually out of his own pocket. By way of partial explanation, respondent apparently expected a fee of about $1,000 from the estate, and hence his remittance of $650 would be more than offset by his expected fee. As concerns the alleged delivery of certain tools and equipment to J. I. Case Company by the respondent, according to the complaint, such items were never received by the company, and respondent was alleged to have committed perjury when he testified under oath that he had delivered them to the Case Company. In this regard, the Grievance Committee found that the respondent was not guilty of perjury. However, the evidence on this particular point is certainly fuzzy and unclear and suggests that respondent was something less than candid in his testimony before the Grievance Committee.

THE HERRING ESTATE

E. I. (Ted) Herring died on April 1, 1963 and his widow, who was appointed to serve as executrix of his estate, engaged respondent as attorney for her and- the *222 Herring estate. It is admitted by the respondent that: (1) he did not file an inheritance tax application till December 30, 1965, despite numerous requests and orders of the county court that he attend to this matter promptly; (2) he did not file an inventory till November 22, 1966, and then only after repeated requests and orders of the county court; (3) he failed to take the necessary steps to include certain assets in the estate and report them for inheritance tax purposes, even though such other assets were called to his attention; and (4) he later failed and refused to close the estate, even though requested to do so.

THE ELIZABETH QUINN ESTATE

Respondent as the attorney for the estate of Elizabeth Quinn, deceased, failed to prepare and file the federal estate tax return and as a result of such inaction the estate was required to pay taxes in excess of the amount which would have been required if the return had been timely filed with the respondent.

THE WILLIAM T. QUINN MATTER

The respondent was employed by Mr. and Mrs. William T. Quinn to prepare their federal and state income tax returns for the years 1957 through 1965 and in connection therewith was paid a fee and from time-to-time was given the necessary information to be used in preparing the tax returns. Furthermore, at respondent’s suggestion, Mr. and Mrs. Quinn signed blank income tax returns and gave them to the respondent with the understanding that he would complete the returns and file them when due. And then the respondent from time-to-time assured the Quinns that he had prepared and filed their returns, when in fact he had not done so. As a result of this series of derelictions, Mrs. Quinn, Mr. Quinn having died in the meantime, was eventually required to pay taxes and interest substantially in excess of what would have been due. •

THE BAILEY AND RIGGEN ESTATES ■

In 1961 respondent was appointed to serve as the *223 attorney in the estate of Adah Bailey and in 1961 he was similarly appointed to serve as attorney for the estate of one John W. Riggen. The Bailey estate involved assets of the value of about $137,344 and the value ;of the assets in the Riggen estate was about $128,080. Respondent failed to file an inventory in either of these estates. In the Bailey estate, respondent filed an inheritance tax application showing deductions of $8,820, whereas deductions actually available to the estate were in the amount of $29,000. When this error was calledto respondent’s attention he took no action to correct the mistake. As concerns the federal estate tax return, in the Bailey estate respondent failed to file such return and as a result thereof an arbitrary assessment was made and penalties and interest in the amount of $5,170 were ultimately assessed. The respondent was apparently paid a fee of $6,000 for the Bailey estate and the penalty and interest thus assessed against the estate came out of respondent’s fee. In the Riggen estate, respondent also failed to. file a federal estate tax return, as a result of which an arbitrary assessment was made of a sum far in excess of the amount which would have been due had the. .return been timely filed. As a result of the failure of the respondent to prepare and file the federal estate tax returns in these two estates, the fiduciaries have been required to employ other attorneys and have paid such attorneys the sum of $4,000, a substantial portion of which would not have been necessary except for respondent’s failure to prepare and file such estate tax returns.

THE JOHN W. AUTRY ESTATE

■Respondent was employed as attorney for this estate and he failed to file an inheritance tax application though admonished several times by . the county court to do so.

......THE M. J. FITZPATRICK ESTATE

■ Respondent was employed as an attorney for the estate and as of the date of hearing before our Grievance Committee, which was October 24, 1968, he had taken no *224 action with respect to the estate since December 1961, though several matters had to be completed before the estate could be closed and though the county court had repeatedly requested the respondent to act.

THE LESTER C. BRADLEY ESTATE

Though admonished by the county court, respondent as attorney for this estate, has taken no action with respect to said estate since January 1963.

THE JOHN A. WILSON ESTATE

Though repeatedly admonished by the court, respondent, as attorney for this estate, had taken no action with respect to the estate, since April 1964.

THE ALICE M. BROWN ESTATE

Respondent was employed as attorney for this estate in 1959 and in that year, respondent presented' a petition to the county court requesting authority to settle a claim of' the deceased in the amount of $7,284.70. Such permission was granted, but respondent thereafter has taken no further action whatsoever with respect to such claim nor'has he ever filed an inventory or inheritance tax application.
The foregoing is believed to be a fair summary of most, though not all, of the various acts of misconduct on the part of the respondent which- led to this proceeding. Our Grievance Committee concluded that the respondent by his own admission had been grossly negligent in hi's handling of the various matters referred to above and that his actions were most definitely contrary to the highest standards of honesty, justice and-morality'.' With this conclusion we are in complete accord. Certainly this is a flagrant case of inattention by a lawyer to .the affairs of his client. This is not.a case involving-an isolated instance of misconduct by an attorney., in ..the handling of matters which have been entrusted to him. Rather, the instant record discloses a long series of transgressions which would seem to indicate that this, is- a way-of-life for the respondent and that this is the fashion *225 in which he handles all of his clients’ legal affairs. Be that as it may, certainly the finding of the Grievance Committee that the respondent has been guilty of gross negligence is fully justified and we hereby concur in this determination.
The only remaining matter, and an important one, is to determine the proper disciplinary action to be imposed by this court on the respondent. For understandable reasons we are — and should be — slow to suspend a lawyer from the practice of his profession. But it must be remembered that the general public has a very definite interest in a proceeding of this type. The public must be afforded protection from the lawyer who accepts the legal problems of his client and then through inaction amounting to gross negligence mishandles such matters to the financial detriment of his client. We conclude that as concerns this respondent the proper disciplinary action is indefinite suspension.
Accordingly, we hereby indefinitely suspend the respondent from the practice of law in this state.